UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADVANCE DIESEL SERVICE, on behalf of itself and all others similarly situated, | **Case No.** 15-04350 |
| Plaintiff | |
| v. | **CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| ESPAR, INC., ESPAR PRODUCTS, INC.,  WEBASTO PRODUCTS NORTH AMERICA, INC., WEBASTO THERMO & COMFORT NORTH AMERICA, INC., MARINE CANADA ACQUISITION INC. d/b/a SEASTAR SOLUTIONS, PROHEAT MECHANICAL SYSTEMS INC., and PROHEAT CANADA, | |
| Defendants. | |

Plaintiff, on behalf of itself and all others similarly situated (the "Class"), brings this action for damages under the federal antitrust laws against defendants Espar Inc., Espar Products, Inc., Webasto Poducts North America, Inc., Webasto Thermo & Comfort North America, Inc., Marine Canada Acquisition Inc. d/b/a/ Seastar Solutions, Proheat Mechanical Systems Inc., and Proheat Canada (collectively "Defendants") arising from a conspiracy to fix, stabilize or maintain prices for Parking Heaters (defined below) for commercial vehicles sold in the aftermarket in the United States from October 1, 2007 through December 31, 2012 (the "Class Period").

Plaintiff demands a trial by jury and alleges, based upon publicly available information, including Espar's price-fixing guilty plea, the European Commission's price-fixing investigation of Parking Heater manufacturers, and information obtained by plaintiff's counsel's extensive investigation, as follows:

## I. NATURE OF THE CASE

1.      This lawsuit is brought as a class action on behalf of Plaintiff and all individuals and entities in the United States who purchased parking heaters for commercial vehicles sold in the aftermarket, including the heaters themselves, accessories sold for use with the heaters, and parking heater kits containing heaters and selected accessories (together, "Parking Heaters") directly from one or more Defendants or their affiliates during the Class Period.  Parking Heaters are auxiliary devices that heat the interior compartment of motor vehicles independent of the operation of the vehicle's engine.  They are used in a wide variety of commercial vehicles. During the Class Period, Defendants sold Parking Heaters in the United States. Parking Heaters sold by the Defendants included two primary types: air heaters, which work by heating interior or outside air drawn into the heater unit, and water or "coolant" heaters, which are integrated into

1

the engine coolant circuit and heat the engine as well as the interior compartment. The term "aftermarket" as it is used in the complaint means the market for Parking Heaters to be installed in vehicles after the vehicles have been sold by the original equipment manufacturers ("OEM").

## II. JURISDICTION AND VENUE

2.     Plaintiff and the Class bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages, including treble damages, for the injuries sustained by plaintiff and the Class resulting from violations by defendants of Sherman Act § 1, 15 U.S.C. § 1.

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337.

4.     Venue is proper in this district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to plaintiff's claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the defendants are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

5.     This Court has *in personam* jurisdiction over each of the defendants because, *inter alia*, each defendant: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Parking Heaters throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

6.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

### III. PARTIES

**A.     Plaintiff**

7.     Plaintiff Advance Diesel Service is a partnership with its principal place of business in Anchorage, Alaska. During the Class Period, Advance Diesel Service purchased Parking Heaters directly from one or more Defendants and has been injured in its business or property by reason of the antitrust violations alleged in this complaint.

**B.     Defendants**

8.     Defendant Espar, Inc. is an Illinois corporation with its principal place of business in Novi, Michigan. On June 25, 2015, Espar Inc. was sentenced to pay a $14.9 million criminal fine after pleading guilty to participating in a scheme to fix prices for Parking Heaters used in commercial vehicles.

9.     Defendant Espar Products Inc. ("EPI") is a Canadian company with its principal place of business in Ontario, Canada.

10.     Both Defendants Espar, Inc. and EPI (collectively, "Espar") are wholly-owned subsidiaries of Eberspaecher Climate Control Systems International Beteiligungs-GmbH ("Eberspaecher"), a privately held German company. Eberspaecher agreed to act as a guarantor to the United States for payment of the criminal fine of $14.97 million imposed on Espar Inc., pursuant to its Plea Agreement.

11.     Defendant Webasto Products North America, Inc. ("WPNA") is a Michigan corporation with its principal place of business in Fenton, Michigan. WPNA is the parent

corporation of its wholly owned subsidiary, Defendant Webasto Thermo & Comfort North

America Inc. ("WTNA").

12.     Defendant Webasto Thermo & Comfort North America Inc. is headquartered in

Fenton, Michigan. WTNA is a wholly-owned subsidiary of WPNA (WTNA and WPNA are

collectively referred to as "Webasto").

13.     Both Defendants WPNA and WTNA are wholly-owned subsidiaries of Webasto

SE, a German company headquartered in Stockdorf, Germany.

14.     Defendant Proheat Mechanical Systems Inc. ("PMSI"), is a British Columbia

corporation with its principal place of business at 300-305 Lansdowne Street, Kamloops, British

Columbia, Canada N2C 1Y1.

15.     Defendant Proheat Canada ("PC"), is an Alberta corporation with its principal

place of business at #104-11215 Jasper Avenue NW, Edmonton Alberta, Canada T5K OL5.

16.     Defendant Marine Canada Acquisition Inc. d/b/a Seastar Solutions ("MCAI"), is a

Canadian corporation with its U.S. headquarters located at 134 West Market Street, Marietta PA

17547. MCAI is a wholly owned subsidiary of American Securities, a leading global private

equity investment firm, which is headquartered in New York. Upon information and belief, MCAI

is affiliated with and controls PMSI and PC, and PMSI are divisions and brands of MCAI. During

the Class Period, PMSI, PC and MCAI (together, "Marine Canada") sold Parking Heaters in the

United States and had dealers in the United States.

17.      Defendants and their co-conspirators, directly and through their affiliates, sold

Parking Heaters in the United States at artificially inflated prices during the Class Period.

## IV. AGENTS AND CO-CONSPIRATORS

18.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct in this Complaint.

19.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

20.     Whenever this Complaint refers to any act, deed, or transaction of any corporate entity, that allegation means that the corporate entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## V.  INTERSTATE TRADE AND COMMERCE

21.     Defendants Espar,Webasto and Marine Canada are the leading manufacturers of Parking Heaters sold in the United States.

22.     During the Class Period, Espar, Webasto and Marine Canada, or through one or more their affiliates, sold Parking Heaters throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

23.     Defendants' and co-conspirators' activities, including the marketing and sale of Parking Heaters has taken place within, and have had and were intended to have, a direct, substantial, and reasonably foreseeable anti-competitive effect upon interstate commerce within the United States and upon import commerce with foreign nations.

24.     The restraints alleged in this complaint have directly and substantially affected interstate commerce in that Defendants have deprived plaintiff and the Class of the benefits of free and open competition in the purchase of Parking Heaters throughout the United States.

25.     Defendants' agreement to inflate, fix, raise, maintain or artificially stabilize prices of Parking Heaters and their actual inflating, fixing, raising, maintaining or artificially stabilizing those prices was intended to and had a direct, substantial and reasonably foreseeable effect on United States commerce and on import trade and commerce with the United States.

## VI. <u>CLASS ACTION ALLEGATIONS</u>

26.     Plaintiff brings this action on behalf of itself and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representative of a Class defined as follows:

> All persons or entities (but excluding government entities and Defendants, their officers, directors, and employees, as well as Defendants' parents, predecessors, successors, subsidiaries, affiliates) who purchased Parking Heaters in the United States, its territories or possessions, directly from any Defendant, or from any of their parents, predecessors, successors, subsidiaries, or affiliates, at any time during the period from and including October 1, 2007 up to and including December 31, 2012.

27.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of Class members is unknown to Plaintiff, it is believed to be in the tens of thousands and geographically dispersed throughout the United States. Furthermore, the Class is readily identifiable from information and records in possession of the Defendants.

28.     Plaintiff's claims are typical of the claims of the Class. Plaintiff and the Class were damaged by the same wrongful conduct by the Defendants, that is, they have paid artificially inflated prices for Parking Heaters as a result of Defendants' anti-competitive and unlawful conduct.

29.     Plaintiff is a member of the Class and will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

30.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

31.     Questions of law and fact common to the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in defendants' anti-competitive and unlawful conduct.

32.     Questions of law and fact common to the Class include, but are not limited to:

a.      Whether the Defendants combined, agreed, or conspired to fix, raise, maintain, or stabilize the prices of Parking Heaters sold in the United States;

b.      The existence, extent and duration of the illegal contract, combination, or conspiracy alleged herein;

c.      Whether the contract, combination, or conspiracy caused prices of Parking Heaters to be higher than they would have been in the absence of Defendants' conduct;

d.      Whether Defendants' conduct caused the prices of Parking Heaters sold in the United States to be at artificially high and non-competitive levels;

e.      Whether Plaintiff and other members of the Class were injured by the defendants' conduct;

f.      Whether Defendants' conduct violated Section 1 of the Sherman Act; and

g.      The appropriate measure of the damages suffered by Class members.

33.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is

impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender. Prosecution as a class action will eliminate the possibility of repetitive litigation. Class treatment will permit the adjudication of relatively small claims by Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this litigation. Thus, absent the availability of a class action, it would not be feasible for Class members to redress the wrongs done to them.

34.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

35.     There will be no material difficulty in the management of this action as a class action.

## VII.  <u>FACTUAL ALEGATIONS</u>

**A.**     <u>**Background**</u>

36.     Operators of commercial vehicles are sometimes forced to idle their vehicles in order to stay warm during rest breaks and other stops, resulting in thousands of idling hours per year. Idling burns hundreds of millions of gallons of fuel and releases hundreds of thousands of tons of dangerous gases into the atmosphere each year. These gases pose a variety of health risks and are damaging to the environment. And according to the United States Department of Energy $1 billion is spent each year on idling-related engine repairs. To combat pollution and healthcare costs from idling, at least 31 states and dozens of municipalities have enacted anti-idling laws forcing commercial vehicle operators to find a greener solution to heat their vehicle cabins. Parking Heaters offer a solution to this problem.

37. Parking Heaters produce heat without the need to run the vehicle's engine or idling. The Environmental Protection Agency ("EPA") has recommended Parking Heaters as an alternative to idling:

> Install a small generator or auxiliary power unit specifically designed for a truck that provides heat, air conditioning, and/or electrical power while the vehicle is not in motion. These devices are a better, more efficient alternative to idling as they use substantially less fuel and emit less pollution. Depending on the amount of time spent idling each year, the payback on these devices can be one to two years. [1]

38. The EPA also has a Clean School Bus's National Idle Reduction Campaign which encourages communities to take actions to curb school bus idling. The goal of the program is to encourage idle reduction to protect the health of children, bus drivers and the community, as well as to improve air quality and to promote idle reduction as a simple way to save money by saving fuel and reducing wear and tear on engines, among other things.[2]

39. Upon information and belief, Espar, Webasto and Marine Canada are the only Parking Heater manufacturers which sell in the United States. As a result, Parking Heaters sold by Espar, Webasto and Marine Canada dominate the market for Parking Heaters in the United States and include two primary types: (1) air heaters, which work by heating interior or outside air drawn into the heater unit, and (2) water or "coolant" heaters, which are integrated into the engine coolant circuit and heat the engine as well as the interior compartment.

### 1.   Air Heaters

40. Air heaters act like small furnaces, with a heating element and blower providing bunk (cab) heat either via direct ducting or via the vehicle's factory-installed HVAC ducting. Air heaters work by heating the air and propelling it into the vehicle compartment to maintain a

---

[1] http://www.epa.gov/region1/eco/diesel/pdfs/Diesel_Factsheet_Truck_Idling.pdf
[2] http://www.epa.gov/cleandiesel/sector-programs/antiidling.htm

desired temperature range without idling. Their heating capacities range from 6,800 to 13,600 Btu/hour and they draw from as little as 0.7 up to 11.2 amps of battery power while in use. Air heaters are about the size of a loaf of bread and weigh around 6-8 pounds. They are usually mounted under or behind the outside of the sleeper cab, with their fuel pumps plumbed directly from the vehicle's fuel tank.

      41.    Air heaters are very fuel efficient, burning from as little as 0.02 to 0.13 gallons of fuel per hour, using, on average, a gallon of fuel during a 24 hour period. During the Class Period, Espar's air heater models included the Airtronic D2, Airtronic D4 and Airtronic D5 heaters;Webasto's models included the Air Top 2000 ST and Air Top Evo 3900 air heaters; and Marine Canada's models included the Proheat A2 and A4 air heaters.Below is a diagram of Espar's Airtronic air heater:



### 2. __Coolant Heaters__

42.     Coolant heaters mainly heat the vehicle's engine and act like hot water furnaces, utilizing the vehicle's own supply of fuel to produce the needed heat. Fuel and air are combined in the systems, generating heat in a combustion chamber. The heater's water-pump warms and circulates engine coolant throughout the vehicle's engine's cooling system to transfer heat to the engine. Some higher Btu capacity models also provide supplemental heating to vehicle cab space.

43.     Coolant heaters regulate the engine's coolant temperature by cycling the heater between various heat levels, depending upon ambient temperature, to maintain appropriate engine coolant heat. This eliminates the need for cold starts. Heat output ranges from 17,100 up to 45,000 Btu/hour and use just 1.9 to 7.5 amps.

44.     Coolant heaters are relatively compact and can be mounted under the hood near the engine or along the frame rail. They are plumbed to the vehicle's fuel tank and burn between 0.07 to 0.4 gallon of fuel per hour. Most models weigh around 6 to 7 pounds.

45.     During the Class Period, Espar coolant heater models included the Hydramic D4 and D5 heaters;Webasto's models included the Thermo Top C, Thermo 90 ST and DBW 2010 heaters; and Marine Canada's was known as the Proheat X45 heater.

46.     Below is a diagram of Espar's Hydronic D5 SC coolant heater:

11



47.     The prices of Parking Heaters range from $800 to $1,500 depending on the type,

Btu capacity, remote control and other options. During the Class Period, Espar, Webasto and

Marine Canada were major manufacturers of Parking Heaters.

48.     During the Class Period, Defendants Espar,Webasto and Marine Canada, had a

controlling share of the United States market for Parking Heaters.

### VIII. DEFENDANTS AND THEIR CO-CONSPIRATORS AGREED TO FIX PRICES FOR PARKING HEATERS

49.     During the Class Period, Defendants Espar, Webasto and Marine Canada

participated in "communications and discussions and attended meetings. . . . During these

communications, discussions, and meetings, agreements were reached to fix, stabilize, and

maintain prices on parking heaters to be sold to aftermarket customers in the United States."

12

50.     The price fixing conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendants "to fix, stabilize, and maintain prices on parking heaters" in the United States.

51.     As part of the conspiracy, Defendants discussed pricing and agreed "to coordinate the "timing and amount of price increases for parking heaters for commercial vehicles sold to aftermarket customers in the United States."

52.     Defendants also agreed to exchange, and did exchange, "information during those conversations and meetings for the purpose of monitoring and enforcing adherence to the agreements."

### IX. DEFENDANTS' PRICE-FIXING CONSPIRACY

53.     Defendants have engaged in a wide-ranging conspiracy during the Class Period to raise, fix, maintain or stabilize the price of Parking Heaters  sold in the United States and have engaged in anti-competitive practices in furtherance of their conspiracy. As a direct result of the conspiracy alleged herein, Plaintiff and the Class paid artificially inflated prices for Parking Heaters purchased from the Defendants.

54.     The conspiracy was specifically directed toward eliminating competition in the United States Parking Heater market and succeeded in its objective of artificially inflating Parking Heater prices within the United States.

55.     During the Class Period, the Defendants had ample opportunities for collusion and opportunities to fix the price of Parking Heaters. Defendants routinely attended trade shows and yearly truck shows. For example, during March 4-6, 2009, defendants Espar, Webasto and Marine Canada attended  the yearly NTEA World Truck Trade Show ("NTEA trade show"), which was held in Chicago, Illinois.

13

56.     During March 10-12, 2010, all three defendants attended the NTEA trade show, which was held in St. Louis, Missouri.

57.     During March 8-10, 2011, all three defendants attended the NTEA trade show, which was held in Indianapolis, Indiana.

58.      During March 4-7, 2012, all three defendants attended the NTEA trade show, which was held in Indianapolis, Indiana.

## X.  THE CHARACTERISTICS OF THE PARKING HEATER MARKET ARE CONDUCIVE TO COLLUSION

59.     The structure and characteristics of the Parking Heater market in the United States are conducive to a price-fixing agreement.

60.     Parking Heaters are sold by manufacturers through distributors, dealers, and directly to original equipment manufacturers as well as owners of commercial vehicle fleets. Espar entered into contracts with "Master Sales and Service Dealers" to distribute and service its Parking Heaters. Each dealer is assigned a geographic territory to sell, install and repair Espar's heaters. Espar's network of dealers includes over 250 dealers that sell, install and repair its Parking Heaters throughout the United States. Similarly, Webasto and Marine Canada have Master Dealers throughout the United States. These dealers receive "advantageous pricing on heater kits and repair parts, direct warranty filing and strong field support directly with your Eberspaecher regional managers and product support team."[3]

61.     All Parking Heaters serve the same purpose of heating the interior motor vehicle cabin space while the engine is turned off. Parking Heaters manufactured by the Defendants also have comparable specifications, such as fuel consumption, size and weight. According to Marine

---

[3] http://www.eberspaecher-na.com/business-units/fuel-operated-heaters/special-programs/thermo-king-dealers.html

Canada's Brian Curliss, a heater that pumps 6,000-7,000 BTUs should be adequate for most applications. Espar, Webasto and Marine Canada manufacture leading Parking Heaters in this range: Espar's Airtronic D2 model, Webasto's Air Top 2000 ST model and Marine Canada's Proheat A2 model. All three models expend approximately the same amount of fuel per hour of operation, are approximately the same size, and have similar features. Moreover, the EPA has conducted tests and determined that defendants' heaters "provide a similar idle reduction benefit." Therefore, purchasers of Parking Heaters are more likely to be influenced by price when making a purchasing decision. However, based upon information and belief, Defendants Espar, Webasto and Marine Canada charged almost identical prices for their respective Parking Heaters of comparable specifications throughout the Class Period.

62.    In addition, the EPA has recommended only Espar's, Webasto's and Marine Canada's heaters for use in commercial vehicles, including in Class 8 trucks and school buses. The EPA recommended models included Espar's Airtronic heaters, Webasto's Airtop 2000 models and Marine Canada's Proheat A2/A4 models for installation in trucks; and Espar's E-Guardian models, Webasto's TSL 17 and Scholostic models and and Marine Canada's Proheat X45 model for installation in school buses.

63.    Purchasers routinely source their Parking Heaters from one of the three defendants. For example, New York State Department of Transportation lists Webasto, Espar and Marine Canada as the only "approved" suppliers of Parking Heaters.

64.    As a result, the United States market for Parking Heaters is dominated by Espar, Webasto and Marine Canada. Espar is one of the largest suppliers of Parking Heaters in North America. Webasto touts itself as the North American leader in "engine-off" heaters for commercial vehicles. Marine Canada states on its website that it is "a global leader in advanced

15

auxiliary heaters. Our customers include aftermarket vehicle dealers and service organizations as well as manufacturers of transport trucks, buses, off-highway, and military vehicles."

65.    There are substantial barriers that preclude or reduce entry into the Parking Heater market. The primary barriers to entry include high start-up costs, manufacturing expertise and know-how and access to distribution channels. For example, Espar's Master Sales and Service Dealers are forbidden from distributing competitors' Parking Heaters within their territories.

66.    Throughout the Class Period, Defendants possessed significant market power to raise prices for Parking Heaters above competitive levels in the United States markets.

67.    There are no economically reasonable substitutes for Parking Heaters. Alternative technologies, such as generators, are more expensive, difficult to install, and have limited heating capability.

## XI. WEBASTO'S ADMISSION OF A CRIMINAL ANTITRUST VIOLATION

68.    The DOJ has a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions. Under this policy, an applicant for leniency "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter."  (Department of Justice, Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (Nov. 19, 2008), http://www.usdoj.gov/atr/public/criminal/239583.pdf).

69.    Upon information and belief, Webasto applied under the DOJ's corporate leniency policy to report price-fixing activity and other conduct potentially violative of Sherman Act § 1 in the Parking Heaters market in the United States and elsewhere in North America.

70.     Upon information and belief, Webasto has been accepted into the DOJ corporate leniency program.

## XI. ESPAR'S GUILTY PLEA

71.     On January 19, 2015, Espar, Inc. pled guilty to a criminal Information brought by the United States charging that from October 1, 2007 through December 31, 2012, Espar participated in a conspiracy among major Parking Heater manufacturers to fix the price of Parking Heaters for commercial vehicles in the aftermarket by agreeing to fix, stabilize, and maintain prices for Parking Heaters sold to aftermarket customers in the United States and elsewhere. The Plea Agreement, which was approved by Espar's Board of Directors and Espar's counsel, states, among other things, that Espar, Inc.:

> through its directors, officers, and employees, including high level personnel of the defendant [Espar], participated in a combination and conspiracy to suppress and eliminate competition by agreeing to fix, stabilize, and maintain prices [of] parking heaters for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America, from at least as early as October 1, 2007 through at least December 31, 2012. In furtherance of the conspiracy, the defendant [Espar], through its directors, officers, and employees, engaged in communications and discussions and attended meetings with representatives of its co-conspirators. During these communications, discussions, and meetings, agreements were reached to fix, stabilize, and maintain prices on parking heaters to be sold to aftermarket customers in the United States and elsewhere in North America.

72.     The Information states that during the relevant period, for the purpose of forming and carrying out the charged conspiracy, Espar, Inc. and its co-conspirators knowingly did those things that they combined and conspired to do, including, among other things:

> (a) participating in communications, discussions, and meetings in the United States and elsewhere to discuss aftermarket prices for Parking Heaters for commercial vehicles;
>
> (b) agreeing, during those conversations and meetings, to set a price floor for Parking Heater kits for commercial vehicles sold to aftermarket customers in the

United States and elsewhere in North America;

(c) agreeing, during those conversations and meetings, to coordinate the timing and amount of price increases for Parking Heaters for commercial vehicles sold to aftermarket customers in the United States and elsewhere in North America;

(d) exchanging information during those conversations and meetings for the purpose of monitoring and enforcing adherence to the agreements described in subparagraphs (b) and (c) above; and

(e) selling Parking Heaters for commercial vehicles to aftermarket customers at collusive and non-competitive prices in the United States and elsewhere in North America.

73.     Pursuant to its plea agreement, Espar pleaded guilty and made a factual admission of guilt to the violation charged. It further agreed and was sentenced on June 25, 2015 to pay a criminal fine of $14.97 million.

## XII. EU COMMISSION FINED ESPAR

74.     In a press release dated June 17, 2015, the European Commission found that Espar and Webasto breached EU antitrust rules by fixing the price of Parking Heaters sold in Europe. According to the press release, from September 2001 until September 2011, Espar and Webasto coordinated prices and allocated customers in the entire European Economic Area (EEA). When the companies received requests for price quotations from customers, they discussed various price elements, agreed which of the two would submit the winning lower bid, and exchanged other commercially sensitive information. The two companies also colluded by harmonizing their annual price lists and the discounts they gave to customers. The announcement came after more than two years of investigation that began with dawn raids in July 2013. The Commission imposed a fine of €68,175,000 on Espar for its involvement in the cartel. Webasto was not fined because it benefited from immunity for revealing the existence of the cartel to the Commission. Upon information and belief, Marine Canada does not sell Parking Heaters in Europe.

### XIII.   PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

75.   Defendants' price-fixing conspiracy had the following effects, among others:

   a.   Price competition has been restrained or eliminated with respect to
        Parking Heaters;
   b.   The prices of Parking Heaters have been fixed, raised, maintained, or
        stabilized at artificially inflated levels; and
   c.   Direct purchasers of Parking Heaters have been deprived of free and open
        competition.

76.   During the Class Period, Defendants charged supra-competitive prices for Parking

Heaters sold by Plaintiff and the Class. By reason of the alleged violations of the antitrust laws,

Plaintiff and the Class have sustained injury to their businesses or property, having paid higher

prices for Parking Heaters than they would have paid in the absence of an illegal contract,

combination, or conspiracy, and, as a result, have suffered damages in an amount presently

undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish

and prevent.

### XIV. FRAUDULENT CONCEALMENT AND TOLLING
### OF THE STATUTE OF LIMITATIONS

77.   Throughout the Class Period and thereafter, the Defendants affirmatively and

fraudulently concealed their unlawful conduct from discovery by Plaintiff and the Class.

78.   Plaintiff and members of the Class did not discover and could not have

discovered through the exercise of reasonable diligence, which they in fact exercised, the

existence of the conspiracy and the Defendants' and their co-conspirators' involvement in

the conspiracy alleged herein until March 12, 2015, when the investigations by the U.S.

Department of Justice first became public.

79.   Because the conspiracy was actively concealed until March 12, 2015, Plaintiff

and members of the Class were unaware of Defendants' and their co-conspirators' unlawful

conduct alleged herein and did not know that they were paying artificially high prices for Parking Heaters.

80.     The affirmative acts of the Defendants and their co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

81.     Defendants and other unnamed co-conspirators agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

82.     Defendants and other unnamed co-conspirators met and communicated secretly concerning the pricing and marketing of Parking Heaters so as to avoid detection.

83.     By its very nature, the price-fixing conspiracy was inherently self-concealing.

84.     In addition, Espar made affirmative representations during the Class Period that it priced competitively. For example, in 2010, Espar presented a report in which it stated that "Espar provides uncompromised quality at competitive pricing."

85.     These false and misleading statements lulled Plaintiff and members of the Class into believing that Parking Heater prices were the result of competitive market forces rather than the product of collusive efforts.  These statements by Defendants were designed to, and did, put Plaintiff and members of the Class off guard and cause them to accept the Parking Heater prices without undertaking further inquiry.  Even had such inquiry been undertaken, it would have proven futile, because Plaintiff and members of the Class did not have access to contemporaneous information that would have allowed them to evaluate whether the prices they were paying for Parking Heaters were competitive.

86.     Plaintiff and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their unnamed co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The conspiracy as herein alleged was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers and surreptitious communications among Defendants and their unnamed co-conspirators by the use of the telephone or in-person meetings in order to prevent the existence of written records.

87.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by defendants and unnamed co-conspirators until March 12, 2015, Plaintiff and the members of the Class had no knowledge of the alleged conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

88.     None of the facts or information available to Plaintiff and members of the Class prior to March 12, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to March 12, 2015.

89.     As a result of the Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims of Plaintiff and members of the Class as a result of the anticompetitive conduct alleged in this Complaint.

## XV. <u>CLAIM FOR VIOLATION OF SHERMAN ACT § 1</u>

90.     Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

91.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their high level officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

92.     The anti-competitive acts were intentionally directed at the United States market for Parking Heaters and had a substantial and foreseeable effect on interstate commerce by raising and fixing Parking Heater prices throughout the United States.

93.     Defendants' and their unnamed co-conspirators' anti-competitive activities have proximately caused injury to Plaintiff and the Class in the United States.

94.     As a direct and proximate result of the contract, combination, or conspiracy among Defendants alleged in this complaint, the prices charged to Plaintiff and the Class for Parking Heaters were unlawfully raised, fixed, maintained, or stabilized in the United States.

95.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

96.     The contract, combination, or conspiracy had the following direct, substantial and reasonably foreseeable effects upon commerce in the United States and upon import commerce:

   a.     Prices charged to Plaintiff and the Class for Parking Heaters were raised, fixed, maintained, or stabilized at supra-competitive levels;

   b.     Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the markets for Parking Heaters; and

   c.     Competition in establishing the prices paid for Parking Heaters has been unlawfully restrained, suppressed, or eliminated.

97.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have been damaged in their business or property by paying prices for Parking Heaters

22

that were higher than they would have been but for Defendants' unlawful conduct resulting in an amount of ascertainable damages to be established at trial.

## XVI. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      The unlawful contract, combination, or conspiracy alleged herein be adjudicated and decreed to have been in violation of Section 1 of the Sherman Act;

C.      Joint and several judgments be entered for Plaintiff and the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees; and

D.      Plaintiff and the Class be granted such other, further relief as the case may require or as the Court may deem just and proper under the circumstances.

## XVII. <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

Dated: July 24, 2015

By: */s/Robert N. Kaplan*
Robert N. Kaplan
Gregory K. Arenson
Richard J. Kilsheimer
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980
Email: rkaplan@kaplanfox.com
garenson@kaplanfox.com
rkilsheimer@kaplanfox.com

Solomon B. Cera
C. Andrew Dirksen
**CERA LLP**
595 Market Street, Suite 2300
San Francisco, California  94105
(415) 777-2230
scera@cerallp.com
cdirksen@cerallp.com

Jeffrey A. Klafter
**KLAFTER OLSEN & LESSER LLP**
Two International Drive, Suite 350
Rye Brook, NY 10573
Tel: (914) 934-9200
jak@klafterolsen.com

*Attorneys for Plaintiff*